UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| WILLIAM R. MCCORMICK, III, | : | |
| CAROL A. MCCORMICK, and | : | |
| WILLIAM R. MCCORMICK, II, | : | |
| | : | |
| Plaintiffs | : | CA. No. 09-474-S |
| | : | |
| vs. | : | |
| | : | |
| MARCELLA E. DRESDALE; RICHARD C. | : | |
| DRESDALE, and | : | |
| | : | |
| BROWN UNIVERSITY IN PROVIDENCE IN THE | : | |
| STATE OF RHODE ISLAND AND PROVIDENCE | : | |
| PLANTATIONS; RUTH SIMMONS, individually and | : | |
| as agent of Brown; DAVID KERTZER, individually | : | |
| and as agent of Brown; RUSSELL CAREY, individually | : | |
| and as agent of Brown; MARGARET KLAWUNN, | : | |
| individually and as agent of Brown; CARLA HANSON, | : | |
| individually and as agent of Brown; TERRY H. | : | |
| ADDISON, individually and as agent of Brown; | : | |
| ROBERT SAMUELS, individually and as agent of | : | |
| Brown; JONAH (ALAN) WARD, individually and as | : | |
| agent of Brown; RICHARD BOVA, individually and as | : | |
| agent of Brown; ROSARIO NAVARRO, individually | : | |
| and as agent of Brown; MICHELLE NUEY, individually | : | |
| and as agent of Brown; COL. MARK PORTER, | : | |
| individually and as agent of Brown; YOLANDA | : | |
| CASTILLO-APPOLLONIO, individually and as agent | : | |
| of Brown; CHUNG NGUYEN, individually and as agent | : | |
| of Brown; SHANE REIL, individually and as agent of | : | |
| Brown (the "Brown defendants"), | : | |
| | : | |
| Defendants | : | |

## AMENDED COMPLAINT

1.      This cause of action arises out of the actions of a combination of actors and entities above

listed as Defendants who, from time to time, are collectively referred to herein as "Defendants",

"Brown defendants" and are at other times referred to by their individual names.

**Parties and Jurisdiction**

2.      Plaintiff, William R. McCormick, III, ("William") is an individual.  During the events described herein, William was a student of Brown University, and resided on the Brown Campus, in Providence, Rhode Island.

3.      Plaintiffs, Carol A. McCormick and William R. McCormick, II ("Carol" and "William McCormick, II") are the parents of William and residents of Waukesha, Wisconsin.

4.      The following defendants are collectively referred to as "the Dresdales".

5.      Defendant, Marcella E. Dresdale ("Beth"), upon information and belief, was and is at all relevant times a student at Brown, and residing in Providence, Rhode Island.

6.      Defendant, Richard C. Dresdale ("Richard Dresdale") is the father of Beth and, upon information and belief, was at all relevant times a resident of 12 Ninigret Avenue, Westerly, Rhode Island and/or 29 Prescott Avenue, Bronxville, New York.

7.      The following defendants are collectively referred to as the "Brown defendants".

8.      Defendant, Brown University in Providence in the State of Rhode Island and Providence Plantations a/k/a Brown University ("Brown"), upon information and belief, is a Rhode Island domestic non-profit corporation.

9.      Defendant, Ruth Simmons, upon information and belief, was at all relevant times the President of Brown, and a resident of Rhode Island.

10.      Defendant, David Kertzer, upon information and belief, was at all relevant times an employee and Provost of Brown, and a resident of Rhode Island.

11.      Defendant, Russell Carey, upon information and belief, was at all relevant times an employee, Assistant Vice President, Interim Vice President for Campus Life and Student

Services, and/or Senior Vice President for Corporation Affairs and Governance of Brown, and a resident of Rhode Island.

12.     Defendant, Margaret Klawunn, upon information and belief, was at all relevant times an employee, Associate Vice President For Campus Life/Dean For Student Life of Brown, and/or Vice President For Campus Life And Student Services of Brown, and a resident of Rhode Island.

13.     Defendant, Carla Hanson, upon information and belief, was at all relevant times an employee and Associate Dean of Student Life of Brown, and a resident of Rhode Island.

14.     Defendant, Terry H. Addison, upon information and belief, was at all relevant times an employee and Associate Dean of Student Life of Brown, and a resident of Rhode Island.

15.     Defendant, Robert Samuels, upon information and belief, was at all relevant times an employee and Associate Dean of the Office of Student Life of Brown, and a resident of Rhode Island.

16.     Defendant, Jonah (Alan) Ward, upon information and belief, was at all relevant times an employee and Senior Associate Dean of Brown, and a resident of Rhode Island.

17.     Defendant, Richard Bova, upon information and belief, was at all relevant times an employee and Senior Associate Dean of Brown, and a resident of Rhode Island.

18.     Defendant, Rosario Navarro, upon information and belief, was at all relevant times an employee and Assistant Director of Residential Life of Brown, and a resident of Rhode Island.

19.     Defendant, Michelle Nuey, upon information and belief, was at all relevant times an employee and the Department of Public Safety Officer of Brown, and a resident of Rhode Island.

20.     Defendant, Col. Mark Porter, upon information and belief, was at all relevant times an employee and Chief of Police And Director of Public Safety of Brown, and a resident of Rhode Island.

21.     Defendant, Yolanda Castillo-Appollonio, upon information and belief, was at all relevant times an employee and Assistant Dean of Student Life of Brown, and a resident of Rhode Island.

22.     Defendant, Chung Nguyen, upon information and belief, was at all relevant times an employee and Dorm Community Director of Brown, and a resident of Rhode Island.

23.     Defendant, Shane Reil, upon information and belief, was at all relevant times an employee and Residential Coordinator of Brown, and a resident of Rhode Island.

24.     The amount in controversy is in excess of the jurisdictional minimum of this Court as set forth in 28 U.S.C. § 1332.

25.     At all times relevant hereto Defendants had sufficient minimum contacts within the State of Rhode Island to satisfy the requirements for subject matter jurisdiction pursuant to Rhode Island's Long Arm Statute.

## Individuals Referenced In Complaint

26.     Amanda Bauer, upon information and belief, was at all relevant times a student at Brown and a friend of Beth.

27.     Laura Bayley, upon information and belief, was at all relevant times a student at Brown, Beth's roommate and a friend of Beth.

28.     Katie Lynn Evans, upon information and belief, was at all relevant times a student at Brown and a friend of Beth.

29.     Michael Burch, upon information and belief, was at all relevant times, an employee of Brown, Assistant Wrestling Coach at Brown, and/or William's advisor for the Brown University disciplinary process.

**General Allegations**

30.     William was a successful high school student and student athlete.  He graduated sixth
(6th) in his class of sixty-nine (69) at a private college preparatory school, attained a grade point
average over a 4.0 (adjusted by advanced placement grading scales), scored above the 95th
percentile on the ACT exam, received a score of four (4) or above on three advanced placement
exams qualifying him as an AP Scholar, and amassed a 43-0 record as a nationally ranked
heavyweight wrestler.

31.     William's his parents were heavily involved in his education and educational choices,
having home-schooled him until high school and investing in private secondary education for
their son.

32.     In or about 2005, Brown University and other highly competitive colleges contacted
William and his parents to recruit him as a student and athlete for the 2006-2007 academic year.

33.     Before March 25, 2005, during his junior year of high school, William, who was
seventeen (17), was actively recruited by Brown with offers of substantial financial incentives
and an Ivy League education.

34.     On September 26, 2005 William turned eighteen (18) years old.

35.     The offers of substantial financial incentives were attractive to William's parents because
it alleviated the financial burden of educating, housing and feeding their dependent, William.

36.     Likewise, William's parents were attracted by the prospect of their son receiving an Ivy
League education at Brown.

37.     William and his parents responded to Brown's advances, and William applied for early
admission.  He was accepted.  As promised to William and his parents, William was awarded
substantial financial incentives including full tuition, room and board.

38.     William's financial aid award at Brown was based on family financial information, including William's parents' federal tax return.  It was to be recalculated annually based on family financial information.

39.     Carol and William McCormick, II entrusted Brown with the education and care of their son, which they had previously provided for William all his life.

40.     Brown emphasizes the importance of its relationship with parents.  Upon information and belief, it is the policy, practice and/or procedure of Brown to communicate with parents on important matters pertaining to the students' academic and social enrichment.

41.     In the fall of 2006, William left Waukesha, and traveled to New England, joining the class of 2010 at Brown University.

42.     During the first few days at Brown, William made friends with a number of his fellow first year students.  One of the students was the defendant, Marcella "Beth" Dresdale ("Beth").  They became friendly, but not romantic.

43.     They resided in the same residence facility, on different floors.

44.     William, from Wausheka, Wisconsin, presents a physically imposing figure, well over six (6) feet tall and well over two hundred fifty (250) lbs.

45.     Beth, from Greenwich, Connecticut, presents a physically unimposing figure.

46.     Upon information and belief, in the first few days of September, Beth's friends made comments to Beth about William, referring to him as her "stalker".

47.     Upon information and belief, Beth exaggerated the amount of attention that William was showing her, making claims *inter alia* that he was calling her excessively on the cell phone and exaggerating the number of times he called.

48.      Upon information and belief, on or about September 5th, one of the friends, Beth's roommate, Laura Bayley, told Beth that the comments about William "stalking" Beth made her anxious and that she didn't want William around them anymore.

49.      Upon information and belief, Beth agreed to go with Laura to ask their Resident Coordinator, defendant Shane Reil ("Reil"), some questions.  They described William McCormick as a "creepy" guy who was "kind of following" Beth.  Among other things, Beth told Reil that the guy would call her up to twenty (20) times a day.  This, and other allegations, were exaggerations and half-truths.

50.      Upon information and belief, Beth was taken aback by the gravity that Reil placed on her complaints, and attempted to undo what she had started by insisting that Reil promise not to share William's identity.

51.      Instead of concluding the matter, Reil escalated it.  Rather than attempt to verify any of the easily verifiable obsessive behaviors complained of – such as merely asking to see the phone log on Beth's cell phone, talking to any witnesses, or even speaking with William – in the dead of the night,  the early morning hours of September 6th, he awoke Andrea Maldonado, the Community Director on-call for the dorm.  Maldonado, in turn, called the Dean on-call, Carla Hanson.

52.      Upon information and belief, in violation of Brown policies, everything said by Beth was immediately accepted as true without investigation or verification.  Dean Hanson effectively took over that night/morning, and spoke directly with Beth.  Beth refused to give William's name to Dean Hanson, realizing that her exaggerations had prompted an overreaction.

53.      Upon information and belief, Beth could not rest that night, because of what she had unwittingly begun.  Upon information and belief, Beth and Reil called Dean Hanson back before

daylight and asked to meet with her as soon as possible because Beth was concerned -- not about the alleged "stalker" -- but about what Dean Hanson might do.

54.     Upon information and belief, Beth and Reil met with Dean Hanson the next morning. Beth still refused to give Dean Hanson a name because she "did not want anything bad to happen to this other student."  Rather than let the matter go, as Beth wished, or attempt to verify any of the claims, much less suspect that Beth had fabricated or exaggerated her complaints, Hanson insisted that Beth promise to meet with a member of Brown's Department of Public Safety, Michelle Nuey, later that same day.  Michelle Nuey was a Special Victims advocate at the Department of Public safety.

55.     After having spent more than an hour with Dean Hanson, Beth acceded, and agreed to meet with Nuey.  Hanson directed Beth to contact her after the meeting with Nuey.

56.     The Department of Public Safety is organized into two major divisions, uniform and administrative.  The Department is further divided into subdivisions.  One division is the Community Policing Bureau (Brown Police) comprised of officers trained in police matters, and graduated from the municipal police academy.  Michelle Nuey was not a Brown Police officer, as she worked in the Community Relations and Outreach Bureau.  However, all divisions report to the Brown Chief of Police.

57.     Upon information and belief, Beth and Reil met with Michelle Nuey at 4:30 pm that day, September 6, 2006.  They met for an hour and a half, until 6:00 pm.  Beth again refused to identify William.  Nuey told her that she did not have to divulge the "stalker's" name, but directed her to immediately contact Nuey if the "stalker" contacted her.

58.     Upon information and belief, Beth did not report back to Dean Hanson, as directed, after meeting with Nuey.

59.    Dean Hanson continued to pressure Reil for a name from Beth.

60.    Upon information and belief, Beth returned to her dorm after that meeting.  It was after 6:00 pm.  Other students on her hall were leaving for dinner at the cafeteria.  Beth said that she was too tired, and needed to prepare for a chemistry placement test.  She remained in her dorm room.  Because of the "stalker" allegations, a friend warned Beth to lock her door.  Her friends ate dinner and returned to the dorm.

61.    Upon information and belief, that night, after her friends returned from dinner, Dean Hanson pressed forward with efforts to get a name.  Hanson pressed Reil to pressure Beth for a name.  As Beth attempted to study for a Chemistry placement test, Reil spoke to her several times.  Upon information and belief, Beth was weary of the pressure and wanted the ordeal to end.  Upon information and belief, Beth spoke with her parents.  That evening, hoping to relieve the pressure and attention, Beth gave Reil permission to disclose William's name.

62.    Upon information and belief, she specifically directed Reil that she did not want any further pursuit of the matter that night, as she had already missed her sailing meeting and practice, was trying to study for a Chemistry placement test, and there was a birthday celebration for a friend in the dorm later that evening, and she wanted to attend.

63.    Reil complied, and Beth studied for the exam and attended the birthday celebration.

64.    William also attended the birthday celebration.

65.    The next day, September 7th, having identified William, Beth was required to file a written complaint with the Office of Student Life.  Beth alleged, among other things, that William was "following me around" and "calling me as much as twenty times a day".

66.    Upon information and belief, in violation of Brown policies, Reil, Dean Hanson and the other Brown defendants, unquestioningly accepted the September 7th complaint as true.

67.     Brown took prompt action against William.  On the afternoon of September 7, 2006, William was directed by Dean Addison to report to his office, where he was served with a no-contact order.  In violation of Brown policies, he was not provided a copy of the complaint, nor was he told the substance of the allegations.  He was not asked for his version of events and was told only that Beth had made a complaint of harassment.

68.     William's room was in the same residence facility as Beth's and his friends lived on Beth's hall.  Accordingly, it was certain that Beth would have to see William on occasion, notwithstanding the order.

69.     On September 7, 2006, sometime after 4:00 pm, Beth claimed that William was violating the no-contact order, that she "saw him outside her dorm door, waiting for her" and that he was talking to "all of her friends trying to get information about her".  Upon information and belief, this allegation was not verified.  Nevertheless, Beth was advised that William would be moved to another dorm, and she agreed that was a good idea.

70.     William was directed to move out of his room, and was told to move all of his belongings to a different residence facility.

71.     William repeatedly asked Brown for the allegations being made against him and for a copy of the complaint.   In continuing violation of Brown policies, the requests were refused.

72.     Meanwhile, rather than fading away, in the days following the September 7th complaint, Beth was unsolicitedly reengaged by Deans and other University personnel.  Upon information and belief, Beth felt that the Deans were "yelling at her", pressing her to add to the complaints about William.

73.     Upon information and belief, Beth's father defendant Richard Dresdale was in regular contact with the administration, including calling high level Brown corporate officers, defendants Russell Carey and Ruth Simmons directly.

74.     Upon information and belief, to appease Richard Dresdale and keep Beth content in the Brown community, the Brown defendants commenced an effort to remove William from campus.

75.     Aware that the administration was pressing Beth for more "information", two girls in Beth's dorm, Amanda Bauer and Katie Evans, concluded that more must have occurred and decided to personally intervene and press Beth.

76.     Upon information and belief, on the evening of September 12, 2006, Katie and Amanda called Beth into Amanda's room to "talk". Yet another protracted interrogation ensued, this time with Katie and Amanda. Katie asked Beth directly if she was withholding information and Beth assured her that she was not. Upon information and belief, they pressed Beth for hours. Katie even specifically mentioned "rape" and asked Beth if she had been raped by William. Beth said "no". They pressed on. Ultimately, Beth stopped talking and did not answer their questions.

77.     When Beth left the room, Katie and Amanda concluded, on their own, without any suggestion by Beth or evidence of any kind, that Beth was "raped".

78.     Upon information and belief, the girls went to Reil. Reil, Katie and Amanda reengaged Beth. After further unsuccessful pressing, they finally resorted to writing down simple leading questions for Beth to answer. Upon information and belief, exhausted, and wanting the ordeal to be over, she said that William had raped her. As to when and where, she said that it happened the week before on September 6, 2006 -- immediately after her meeting with Ms. Nuey and during the brief period she was alone in her dorm room, while her friends were at dinner.

79.     In fact, William had not raped Beth.

80.     In fact, William had no contact with Beth whatsoever during the time that Beth claimed that the forcible rape occurred.

81.     The next day was September 13, 2006, Reil took Beth to meet with Dean Ward and Dean Bova at 4:00 pm.  At the meeting, Beth was reluctant to repeat the rape allegation.

82.     Upon information and belief, Beth did not tell them that she was raped but instead Reil spoke on her behalf.

83.     Upon information and belief, Beth did not write the rape allegation in the amended complaint, but Reil authored the rape allegation for Beth.  The written allegation accused William of the classic definition of rape by forcible sexual penetration.

84.     An amended complaint was filed.

85.     In violation of its own policies, Brown accepted Beth's new allegation of rape as true.

86.     Upon information and belief, in violation of Brown policy, the Brown defendants did not conduct a neutral investigation of Beth's rape allegation.

87.     Moreover, the Brown defendants did not notify the Brown Police, or any law enforcement authority, of the alleged capitol offense that had occurred on its premises, effectively ensuring that an appropriate rape investigation would not take place.

88.     Instead, the Brown defendants took immediate action against William.

89.     That day, September 13, 2006, William was ordered to either remain in his room under guard by campus security or be removed from campus.  He elected to leave, and was picked up by his assistant wrestling coach, Michael Burch, and remained at Burch's home.

90.     The following morning, September 14, 2006, William was ordered to the Office of

Student Life, placed in a conference room, and further confined there.  He was detained for

hours.  Still, no law enforcement agency was notified or involved.

91.     After several hours, Russell Carey, Margaret Klawunn, Robert Samuels, Allen Ward and

Terry Addison entered the conference room.  William was advised only that the allegation

against him was "sexual misconduct".  He was not provided a copy of the complaint and was not

advised of the substance of the complaint.  William was not asked for his version of the events,

and was offered no chance to respond to the allegations.

92.     William was then removed and barred from campus.  Russell Carey handed him a one-

way ticket to Wisconsin.

93.     William was ordered to pack his things, was placed in a vehicle arranged for by Brown,

and was transported to the airport.  He was placed on a one-way flight back home to his parents,

in Wisconsin.

94.     After William's arrival in Wisconsin, Brown continued its refusal to provide William

with a copy of the complaint.

95.     After William and his parents repeatedly requested a copy of the complaint, Brown

agreed to read it to William and his mother, Carol, over the telephone.

96.     Upon information and belief, defendant Richard Dresdale was in regular contact with one

or more of the Brown defendants, including but not limited to Russell Carey.

97.     Upon information and belief, the Brown defendants set out to ensure that William would

not return to Brown.

98.     Under Brown's policies, William was entitled to a full University Disciplinary Council

(UDC) Hearing before a panel consisting of students (his peers), faculty and deans.

99.     Once William had been removed from Campus, the Brown defendants still did not appropriately investigate the complaint, but set upon a course to gather statements that would only support Beth's version and actively interfered with William's ability to expose the truth and exonerate himself.

100.    Upon information and belief, at no time did Brown involve anyone with professional training and experience in investigating sexual assault.

101.    *Inter alia*, the Brown defendants interfered with William's and his parents' access to potential witnesses; delayed and refused to provide documents, evidence and information that would tend to rebut the veracity of the complaint; and even continued to refuse to provide them with a copy of the written complaint against William.

102.    Sequestered hundreds of miles away, in Waukesha, Wisconsin, William and his parents were forced to rely on William's University advisor, Michael Burch, to conduct the investigation that Brown was refusing to conduct, and collect information and evidence in preparation for the hearing.

103.    The Brown defendants interfered with the efforts of Michael Burch to investigate the allegations, and collect information and evidence, in preparation for William's defense.

104.    Brown defendants' actions and inactions had the intended effect of largely crippling William's ability to defend himself.

105.     Moreover, upon information and belief, a Brown dean unilaterally designated William's hearing to be an administrative hearing, decided solely by Brown administrators, rather than a UDC hearing with student peers, faculty and deans.

106.    Upon information and belief, Beth Dresdale's father, Richard Dresdale, is an alumnus of Brown, and has donated and raised very substantial sums of money for Brown.

14

107.    The Dresdales hired a lawyer to represent Beth.

108.    Plaintiffs became aware of the Dresdales' significant means and their influence with Brown.

109.    William and his parents reasonably came to believe that given Brown's completely one-sided handling of the matter, Brown's failure to adhere to its own policies, Brown's displayed lack of interest in the truth, Brown's measures to prevent others from revealing the truth, Brown's removal of William's peers from the hearing process, and their perception of the Dresdales' influence, William would not be provided a fair hearing.

110.    The McCormicks were of modest means, but with William and his parents being in Wisconsin, and only Mr. Burch representing their interests at Brown and in Rhode Island, the McCormicks were compelled to retain an attorney to advise them.

111.    Believing that they were facing insurmountable opposition from Brown and the Dresdales, William and his parents, through counsel, began working toward an arrangement whereby William would give up his scholarship, and leave Brown permanently in exchange for certain consideration requested by William or on his behalf, some of which would have required Brown's cooperation.

112.    William's and his parents' terms were rebuffed.

113.    William's attorney focused almost solely on completing an agreement, rather than defending William, proving his innocence, and exposing the falsity of the allegations against him.

114.    The resulting document was one-sided, unconscionable, and contained no material consideration for the life altering prices extracted from William therein.

115.    Not willing to sacrifice his opportunity at Brown, William said he was not prepared to sign, and asked for additional time to consider the proposed agreement.

116.    Prior to William's expression of reluctance, Beth had indicated no intention of pursuing criminal charges and, in fact, had no intention of doing so.  No criminal complaint has ever been filed and, in fact neither the Brown Police nor the Providence Police were even notified of the alleged campus rape.

117.    However, when William expressed resistance, Beth's lawyer issued a thinly veiled threat of criminal rape charges, unless William signed the "agreement" by 5:00 p.m. that day.

118.    Upon information and belief, defendants Richard Dresdale and Beth were aware of and/or directed the issuance of the threat of criminal charges.  Upon information and belief, Beth's lawyer issued the threat with her and Richard Dresdale's knowledge, expressed and/or implied consent, and as their agent.

119.    Upon information and belief, the Dresdales' attorney was acting as counsel and/or agent for the Dresdales when he delivered the threat.

120.    In Rhode Island, Beth's accusations of rape by forcible penetration would have resulted in capital charges of First Degree Sexual Assault, an offense punishable by a minimum of ten (10) years in prison and up to lifetime imprisonment.  R.I.G.L. § 11-37-3.

121.    Faced with the threat of first degree sexual assault charges, upon his return to Rhode Island, William was forced to yield, he signed the "agreement" and his scholarship and Ivy League education were lost.

122.    William signed the agreement as ordered, under duress and under the implied threat of false criminal rape charges.

123.    The threat of criminal charges was, and is, ongoing and continuous up to the present, diminished only when the filing of the original complaint in this case did not prompt Beth, Richard Dresdale and their attorney to follow through on the threat.

124.    Still, no charges have been filed.

125.    William had a pre-existing medical condition resulting in seizures which had been well controlled prior to the above incidents.  As a result of the actions and inactions of all defendants, William suffered extreme emotional distress, and a substantial increase in seizure activity, requiring medical treatment and medication.

126.    Witnessing the emotional impact on William, as well as William's seizure disorder becoming symptomatic as a result of the all the events described above, caused severe emotional distress to William's parents resulting in physical harm including weight and sleep loss to Carol McCormick, and an increase in medical attention required for William McCormick, II's cardiovascular condition.

127.    An objective consideration of the circumstances leading to the rape charge, and basic investigation into the truth of the allegations, would have promptly revealed the falsity of the rape allegations.

128.    Brown defendants knew or should have known of the falsity of the rape allegations.

129.    Upon information and belief, the wrongful conduct of the Brown defendants set forth above was motivated, *inter alia*, by financial self-interest, and without regard to the permanent damage inflicted upon William McCormick and his parents.

130.    William and his parents acted with reasonable and due diligence to pursue their rights set forth in this amended complaint as well as the initial complaint, and in repudiation of the aforementioned "agreement" with Beth.

17

## COUNT I

### BREACH OF CONTRACT

#### (As to Brown defendants – William McCormick, III)

131.    Plaintiff, William McCormick, III hereby repeats and realleges the above allegations as though fully set forth herein.

132.    Based on the above facts and circumstances, the Brown defendants breached expressed and/or implied agreement(s) with William, as well as implied covenants of good faith and fair dealing.

133.    As a proximate result of these breaches, William suffered injuries including physical injuries, emotional distress, loss of educational and athletic opportunities, economic injuries, and other damages direct and consequential.

## COUNT II

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### (As to all defendants – William McCormick, III)

134.    Plaintiff, William McCormick, III hereby incorporates the above allegations as if set forth fully herein.

135.    Brown defendants intentionally, and/or with willful or wanton indifference to the truth, engaged in the above described conduct, and otherwise intentionally inflicted emotional distress upon William.

136.    Brown's conduct was extreme, outrageous and outside the bounds of common decency.

137.    Beth intentionally, and/or willfully, recklessly, and falsely accused William of First Degree Sexual Assault (rape), and otherwise intentionally inflicted emotional distress upon William.

138.    Beth's conduct was extreme, outrageous and outside the bounds of common decency.

139.    Richard Dresdale intentionally, and/or willfully and recklessly, engaged in the above described conduct including causing the removal of William from Brown without regard to the truth of the rape allegations, and otherwise intentionally inflicting emotional distress upon William.

140.    Richard Dresdale's conduct was extreme, outrageous and outside the bounds of common decency.

141.    The above actions and inactions by Defendants proximately caused mental anguish and severe emotional distress to William, as well as physical harm, financial loss, humiliation, loss of reputation, and other damages.

## COUNT III

### NEGLIGENCE

(As to all defendants – William McCormick, III)

142.    Plaintiff, William McCormick, III hereby incorporates the above allegations as if set forth fully herein.

143.    Brown defendants owed duties of care to William, including, but not limited to a duty of reasonable care in the conduct of the investigation of the allegations of rape.

144.    Brown defendants breached its duties owing to William.

145.    Beth owed duties of care to William, including, but not limited to a duty of reasonable care in not making false and/or reckless accusations of forcible rape, or allowing such allegations to be made on her behalf.

146.    Beth breached her duties owing to William.

147.    Richard Dresdale owed duties of care to William, including, but not limited to a duty of reasonable care in not seeking actions against William, including removal from Brown University, without regard to the truth of the rape allegations.

148.    Richard Dresdale breached his duties owing to William.

149.    As a proximate result of said breaches, William suffered injuries including irreparable reputational harm, severe emotional distress, physical injuries, economic injuries, and loss of educational and athletic opportunities, and other damages.

## COUNT IV

### FALSE IMPRISONMENT

(As to Brown defendants – William McCormick, III)

150.    Plaintiff, William McCormick, III hereby incorporates the above allegations as if set forth fully herein.

151.    Brown defendants intentionally detained William without legal justification, without his consent, with without right or privilege to do so.

152.    As a proximate result of Brown defendants' conduct, William suffered injuries including irreparable reputational harm, severe emotional distress, economic injuries, physical injury, loss of educational and athletic opportunities, and other damages.

## COUNT V

### LIBEL

(As to all defendants – William McCormick, III)

153.    Plaintiff, William McCormick, III hereby incorporates the above allegations as if set forth fully herein.

154.    The written allegations of rape against William were false and defamatory.

155.    The written allegations of rape against William were not privileged or otherwise

protected speech.

156.    Defendants knew or should have known of the falsity of the allegations.

157.    Defendants caused or contributed to the publication of the false allegations.

158.    As a proximate result of the above conduct, actions and inactions, William suffered

damages, physical, emotional, reputational harm, economic injuries, and loss of educational and

athletic opportunities.

## COUNT VI

### EXTORTION

(As to Marcella Dresdale and Richard Dresdale – William McCormick, III)

159.    Plaintiff, William McCormick, III hereby incorporates the above allegations as if set forth

fully herein.

160.    By their conduct set forth above, including threatening to accuse William of a crime or

other offense with the intent to compel him to sign an agreement to waive his rights and sacrifice

his scholarship and Ivy League education, defendants Beth and Richard Dresdale individually,

and by and through her agent(s), engaged in illegal extortion of William.

161.    Defendants, Beth and Richard Dresdale are liable to William for extortion.

162.    As a proximate result of the above conduct, William signed the aforementioned

settlement agreement, suffered damages, physical, emotional, reputational harm, economic

injuries, and loss of educational and athletic opportunities.

## COUNT VII

### ACTS TANTAMOUNT TO CRIMALITY

(As to all defendants – William McCormick, III)

163.     Plaintiff, William McCormick, III hereby incorporates the above allegations as though full set forth herein.

164.     Defendants engaged in actions and inactions that alone or combined are tantamount to criminality.

165.     As a proximate result of the above conduct, actions and inactions, William suffered damages, physical, emotional, reputational harm, economic injuries, and loss of educational and athletic opportunities.

## COUNT VIII

### BREACH OF CONTRACT

(As to Brown defendants – Carol and William McCormick, II)

166.     Plaintiffs, Carol and William McCormick, II hereby incorporate the above allegations as though fully set forth herein.

167.     Based on the above facts and circumstances, Brown and the Brown defendants breached expressed and/or implied agreement(s) with Carol and William McCormick, II, as well as implied covenants of good faith and fair dealing.

168.     As a proximate result of these breaches, Carol and William McCormick, II suffered injuries including physical injuries, emotional distress, economic injuries, and other damages direct and consequential.

## COUNT IX

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

(As to all defendants – Carol and William McCormick, II)

169.    Plaintiffs, Carol and William McCormick, II hereby incorporate the above allegations as if set forth fully herein.

170.    Brown defendants intentionally, and/or with willful or wanton indifference to the truth, engaged in the above described conduct, and otherwise intentionally inflicted emotional distress upon Carol and William McCormick, II.

171.    Brown's conduct was extreme, outrageous and outside the bounds of common decency.

172.    Beth intentionally, and/or willfully and recklessly, falsely accused Carol and William McCormick, II's son of First Degree Sexual Assault (rape), and otherwise intentionally inflicted emotional distress upon Carol and William McCormick, II.

173.    Beth's conduct was extreme, outrageous and outside the bounds of common decency.

174.    Richard Dresdale intentionally, and/or willfully and recklessly, engaged in the above described conduct, including causing the removal of Carol and William McCormick, II's son from Brown University without regard to the truth of the rape allegations, and otherwise intentionally inflicting emotional distress upon Carol and William McCormick, II.

175.    Richard Dresdale's conduct was extreme, outrageous and outside the bounds of common decency.

176.    The above actions and inactions by the defendants proximately caused mental anguish and severe emotional distress to Carol and William McCormick, II, as well as physical harm, financial loss, humiliation, loss of reputation, and other damages.

## COUNT X

NEGLIGENCE

(As to all defendants – Carol and William McCormick, II)

177.    Plaintiffs, Carol and William McCormick, II hereby incorporate the above allegations as if set forth fully herein.

178.    Brown defendants owed duties of care to Carol and William McCormick, II, including, but not limited to a duty of reasonable care in the conduct of the investigation of the allegations of forcible rape amounting to a First Degree Sexual Assault.

179.    Brown defendants breached its duties owing to Carol and William McCormick, II.

180.    Beth owed duties of care to Carol and William McCormick, II.  Such duties included, but were not limited to a duty of reasonable care in not falsely and/or recklessly accusing Carol and William McCormick, II's son of forcible rape.

181.    Beth breached its duties owing to Carol and William McCormick, II.

182.    Richard Dresdale owed duties of care to Carol and William McCormick, II, including, but not limited to a duty of reasonable care in not seeking to remove Carol and William McCormick, II's son, William, from Brown University without regard to the truth of the rape allegations.

183.    Richard Dresdale breached duties owing to Carol and William McCormick, II.

184.    As a proximate result of said breaches, Carol and William McCormick, II suffered injuries including irreparable reputational harm, severe emotional distress, physical injuries, and economic injuries, and other damages.

PRAYER FOR RELIEF

185.   Wherefore, Plaintiffs pray for the following relief:

    A.   Damages, in an amount to be established at trial, as compensation for injuries for all damages incurred by plaintiffs, including but not limited to damages to physical well being, emotional damages, damages to reputation, past and future economic losses, loss of educational and athletic opportunities, loss of future career prospects, legal and other expenses;

    B.   Exemplary and punitive damages, in an amount to be established at trial, as provided for by statute and/or Rhode Island law;

    C.   Attorneys fees and expenses, as provided for by statute and/or Rhode Island law.

    D.   Reasonable and customary costs and expenses incurred and interest accrued in pursuit of this action;

    E.   Other relief deemed just and proper.

**<u>JURY TRIAL DEMAND</u>**

Plaintiffs hereby request a trial by jury on all claims so triable, and designates J. Scott Kilpatrick as Trial Counsel.

        Plaintiffs, by their attorney,

        */s/ J. Scott Kilpatrick*
        J. Scott Kilpatrick, Esq. (#4036)
        Chisholm Chisholm & Kilpatrick LLP
        One Turks Head Place - Suite 1313
        Providence, RI   02903
        (401) 331-6300
        (401) 421-3185 Fax
        jskilpatrick@cck-law.com